# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

________________________________

NIMA GHARAVI, an individual, and
RIGHT CALL OFFICIALS, INC., an
Illinois corporation,
Plaintiffs,
v. Case No.
JESSICA PRESLEY; MATSCOUTS, LLC; 1:24-cv-1969
WILLIE SAYLOR; PATRICK MINEO;
STEPHEN KOLANKOWSKI; JOSEPH
CORSINI; IAN JAGGER; and JOHN
DOES 4-25,
Defendants.

________________________________

DEPOSITION OF PATRICK MINEO

DATE: Monday, January 19, 2026
TIME: 10:04 a.m.
LOCATION: Remote Proceeding
Northampton, PA 18067
REPORTED BY: Karen Keim
JOB NO.: 7826115

Page 42

on demand versus having to watch a competition or a game when it's live on television. And so I'm just curious based upon the fact that you've been a long-time wrestling fan and spectator, what your understanding is of the differences of availability of certain things that might be available on the internet versus on television?

Do you have an understanding of the what's available on online versus what's available on television?

A I -- I don't exactly understand the question, but as an adult I understand the difference between TV and internet. Yes.

Q What types of wrestling matches are generally available online that aren't available on television?

A I can't speculate on that.

Q Okay. Do you ever watch wrestling matches online?

A I have in the past.

Q Can you expand on that, please?

A I've watched wrestling matches online in the past.

Q How often?

Page 43

A I can't speculate on how often.

Q I'm not asking to speculate, but I would like to understand for you an estimate of how many hours a month you would say that you would watch wrestling online over the last couple of years?

A Yeah. I -- I don't recall the exact timeframes.

Q Okay. When is the last time you recall watching any wrestling matches online?

A Some time last year, perhaps.

Q Okay. So in 2025 you're referring to?

A Yes.

Q Do you recall what you watched online?

A No.

Q What about in 2024?

A I don't recall.

Q What about 2023?

A I do not recall specifics about viewership online.

Q Okay. If you don't recall specifics, what do you recall?

A That I watched wrestling.

Q Okay. Do you recall what kinds of wrestling you watched online?

Page 44

A Wrestling matches.

Q No more specific than that?

A I don't recall specifics regarding exactly what I watched in the past.

Q We were talking about Facebook a few minutes ago and your understanding of how Facebook works. You also understand how posts can be shared and amplified on Facebook. Is that right?

A I understand how they can be shared.

Q Give me one moment. Are you an administrator of the Facebook group called the Wrestling Room?

A Yes. I'm one of three administrators.

Q Who are the other two?

A Jeffrey and Joseph.

Q What are their last names?

A Jacobs and Swirble.

THE REPORTER: You're going to have to repeat or spell those names for me, please.

BY MR. BECKER:

Q Yes. Why don't you go ahead and state the full names and spell them so that the court reporter can have an accurate record?

A Jeff Jacobs. Jeff, J-E-F-F J-A-C-O-B-S.

Page 45

Joe Swirble. J-O-E S-W-I-R-B-L-E.

THE REPORTER: Thank you.

BY MR. BECKER:

Q Did you create that group or did one of the other two administrators create that group?

A I created it.

Q When did you create it?

A Late 2019.

Q Approximately how many members are in that group?

A Approximately 80,000 plus, perhaps.

Q It's one of the largest wrestling groups on Facebook. Correct?

A I can't speculate on other groups.

Q Do you know any groups that are larger than this one?

A Yes. I do, actually. Yes.

Q Which groups are you aware of that are larger than this one?

A I recall a group called -- that was called Wrestlers Only that -- that was -- was -- larger. Yeah.

THE REPORTER: Again, could you -- could you repeat that name?

Page 46

THE WITNESS: I recall a group called Wrestlers Only that was much larger than my group.
BY MR. BECKER:
Q Any other groups that you can recall that are larger than your group?
A I can't speculate on other groups on Facebook that aren't mine.
Q Well, I'm asking if you have any personal knowledge having visited other groups as to whether you've seen groups that are larger than the wrestling group the Wrestling Room?
A I -- I named one that I have seen. Like I said, I can't be for certain that there is no other groups larger, so that's why I can't speculate on it.
Q I'm actually not asking you to speculate. I'm asking if you have personal knowledge of any groups that are larger than the Wrestling Room?
A Yes. Yes.
Q You've mentioned one. Are you aware in your personal knowledge of any groups larger than the Wrestling Room?
A Aside from Wrestlers Only? Personally, no.
Q Okay. Are you proud of building this community within the Wrestling Room?

Page 47

A I enjoy it.
Q What are your responsibilities as a group admin of that Wrestling Room group?
A Basically, created the group and contribute, post, things of that nature.
Q You approve new members. Correct?
A Not just me personally. There are different avenues to do that. You know, there's other admins. There is also auto-approvable things that -- that are in play. So I did not personally approve every member. No.
Q But as a admin of the page of the group, you have the ability to approve new members joining the group. Correct?
A Yes. Yes.
Q And as an admin, you also have the ability to set group rules. Is that right?
A I'm not aware of that, so I -- I've never set, like, a group rule thing. Yeah.
Q Do you know if -- do you know whether as an admin of that group you have the ability to set group rules, whether you've done so or not?
A I -- I don't recall. I've -- I've not seen that personally, so I've -- I've never looked into

Page 48

that. So I can't speculate on Facebook's abilities.
Q So the answer is "No"? You don't know whether you can do that or not?
A I'm not aware.
Q Okay. As an admin of that group, you can remove posts. Correct?
A Yes. We have that ability.
Q You can remove members? I'm sorry. Go ahead.
A Yes. Yes. We have that ability.
Q Okay. And as an admin, you can also remove members. Correct?
A Correct.
Q You could ban members from the group if you wanted to?
A Correct.
Q As an admin, do you also have the ability to moderate discussions?
A Can you elaborate on "moderate"?
Q Do you know what it means to be a group moderator of online discussions?
A I created the group. I'm an admin, but I do not sit and moderate every conversation. No. I -- I don't have the time to do that.

Page 49

Q What is the purpose of the Wrestling Room group?
A Wrestling community. Just for people to talk about wrestling.
Q What are the types of individuals that are members of this group?
A I can't speculate on all the different types of individuals.
Q You can probably have some knowledge, do you not, of some of the types of individuals that are part of this group. Right?
A I can't speak for other people and how they identify.
Q I'm asking what your personal knowledge is, sir. Do you know if there's any members of the group that are parents of wrestlers?
A Yes. I'm sure there is. Yes.
Q Okay. And are members of the group also likely Wrestlers themselves?
A Yes. I'm sure.
Q Wrestling fans like yourself?
A Yes.
Q Wrestling coaches?
A Yes. I'm sure.

Page 130

Mr. Gharavi to ask him for his side of the story at all?
A No. I did not.
Q Did you contact YouTube to report your concerns that you referenced in this post?
A No.
Q Did you contact the IHSA to ask about their investigation at any time?
A No.
Q Did you contact any law enforcement?
A No.
Q Did you contact the FBI?
A No.
Q You didn't do any of that. Correct?
A No. Correct.
Q Instead, you decided to post your concerns to your audience on Facebook. Correct?
A Well, not instead, but I posted -- I posted my opinions. Yes.
Q How many views did this post get?
A I have -- I have no idea. I don't think it says the amount of views.
Q How many posts -- or how many comments did this post get?

Page 131

A It looks like 148.
Q And again, you tag the IHSA directly. Correct?
A Yes.
Q You wrote "@IHSA must look into revoking this person's referee license." Correct?
A Correct.
Q You specifically tagged the IHSA?
A Yes. I did.
Q Why did you tag them?
A I just tagged them. As you can see, the tag actually didn't -- didn't attach because it's a private group. So it actually didn't attach to -- to them, so they wouldn't have been able to see it. But yeah. It's -- it is @IHSA, but as they're obviously not a member of the group -- it's a private group. They wouldn't have been able to see it.
Q But you did attempt to tag them?
A Well, I did tag them here. Yeah. Yeah.
Q You wanted them to see your post. Correct?
A I -- I tagged them. It doesn't mean that I wanted them to see my post. But I tagged them.
Q You wanted them to investigate Mr. Gharavi?
A No. That's not what I said.

Page 132

Q You say, "You must also look into revoking this person's referee license." Don't you?
A That was my opinion based on everything circulating.
Q I'm sorry. I can't hear you very well.
MR. BECKER: Karen, can you hear him?
THE REPORTER: Mostly. I mean, I'm -- I'm getting it. Yes.
BY MR. BECKER:
Q That -- I didn't get the last answer.
A Yeah. That was my opinion.
Q That you wanted them to investigate him. Correct? And revoke his license?
A I didn't say anything about investigation. I just gave an opinion.
Q Okay. You wanted them to revoke his license. Correct?
A I said, "look into," which is pretty vague.
Q Well, it seems to me that that would be to investigate him before they revoked it. Right? You wouldn't be asking an organization to revoke his license without doing any investigation. Would you?
A I said to look into it based on the public concern.

Page 133

Q I'm trying to give you the benefit of the doubt here that you're not simply asking the IHSA to revoke this guy's license blindly, but rather they would do so after they've actually conducted a reasonable investigation.
But if you're saying that you didn't ask them to investigate and simply asked them to look into revoking it, I'll accept that as your answer instead.
A This -- this is -- this -- you -- you're freezing. I'm not able to -- can you hear me?
Q I can hear you.
A Okay. You're -- you're back. You're -- you were freezing there.
MR. BECKER: Did my question come through at all, Karen?
THE REPORTER: Yeah. I -- I heard your question fine.
THE WITNESS: If you could please repeat it there. The -- it -- it froze for a moment while you were speaking.
MR. BECKER: Karen, can you read that back, please?
THE REPORTER: Yes. I will.
//

Q Well --
A I produced what I had.
Q There's sentences that are cut off at the bottom, sir. How did you go about gathering that information to produce and discovery?
A I produced the communications I had and retained that were reasonably available to me at the time. And I preserved everything once I was served.
Q Functionally, how did you go about doing that?
A I -- I don't recall the exact specifics. This was years ago.
Q No. I mean, how you went about producing it in discovery in this case?
A I -- I produced screenshots that I had.
Q How did you take those screenshots?
A I -- I don't recall. It was two years ago. I produced what I had.
Q Have you changed the way that you take screenshots of your computer since then?
A No. It wasn't screenshots from my computer. But I produced what I had and what was available to me.
Q Okay. You said that. I understand that.



I'm trying to understand how you went about doing that. So you said it wasn't from your computer. What was it from?
A I believe it was maybe mobile screenshots. I'm -- again, this was -- this was, like, two years ago. So I don't recall specifics.
Q And you've preserved everything since that time
A Since I was served. Correct.
Q Had the FBI contacted you, sir, about this matter?
A No. They didn't contact me because I didn't make a report with the FBI.
Q So you hadn't contacted the FBI, either. Is that correct?
A No. I did not. As I stated, I was told that Ms. Ritacco independently contacted the FBI.
Q So she told you she contacted the FBI. Correct?
A Yes. She did.
Q All right. Has anyone told you the FBI was actively investigating the matter?
A Aside from Ms. Ritacco? She -- she had said they are, and I -- about -- as well.



Q So she said they were investigating it?
A Again, that's what she said. Yes.
Q Did you do anything to personally corroborate the truthfulness of that statement?
A No. I -- I did not.
Q Had you seen any FBI documents or communications?
A Nope. I did not see any FBI documents.
Q So you had zero contact with the FBI. Correct?
A Correct.
Q And other than Ms. Ritacco telling you that she contacted the FBI, you had zero evidence the FBI was involved at all in investigating this matter. Correct?
A Correct.
Q You feel -- what was the reason you posted that comment here on social media?
A Because I was notified that Jennifer Ritacco told me she reported it to the FBI. And as I stated, she said that they were investigating it.
Q Do you think that posting this comment about the FBI investigated made it seem like official law enforcement agreed with your opinions?



A No. I -- they don't.
Q You didn't post this to make your allegations seem more credible?
A No.
Q You didn't post this to make people believe the government agreed with you?
A No.
Q You understand that falsely claiming that the FBI is investigating an individual is a serious issue. Correct?
A Yes.
Q And as we sit here right now, your testimony is that other than what somebody told you they did in communicating with the FBI, you don't actually have evidence that the FBI was actually investigating this matter moving forward?
A Well, aside from your own subpoenas that you produced that showed the FBI was investigating prior, which I didn't know until you produced them. No.
Q So that's what happened in this case. The documents you're referring to are in this discovery in this case?
A I'm talking about -- aside from Jennifer Ritacco --

Page 190

A Yes. It was a general statement of safety in the wrestling community. There's no specific things noted in it. I wasn't referring to any specific individual organized group. It was general online commentary and public discussion. Nothing more.
Q Do you know if this post was deleted at any point in time by you?
A I have -- I have --
Q I'm sorry?
A Yeah.
Q I can't hear you.
A I have no idea. I said -- can you hear me?
Q We can hear you now. You said you have no idea. You just froze for a moment. Let's go to Exhibit 12, which is bates stamped Gharavi 118.
(Exhibit 12 was marked for identification.)
One second. Okay. So on this one here, you posted after someone named Logic is Dead said, "Why isn't USA Wrestling doing anything?" And then you say, "People knew for a while and treaded so lightly, everyone is scared to get sued because of that person's sxl orientation. (Which isn't the issue.)"

Page 191

So first, is that a post that you posted that you authored?
A Yes. That is a post that I authored. I'm reading over it now.
Q And you posted this within the Wrestling Room group on X, I assume?
A There's no Wrestling Room group on X.
Q That's Facebook?
A No. That's -- that's not on Facebook. No. That's -- that's just on X.
Q Okay. So this is -- okay. I see. So your username there is Wrestling Room (Pat Mineo). This is the MrPatMineo username on X. So you posted this on X. That's all. Right? Is that what you're saying?
MR. BECKER: Karen, can you hear me? Karen?
THE REPORTER: I can hear you fine. Yes.
MR. BECKER: So is he frozen?
THE REPORTER: Yes. On my end he is.
MR. BECKER: Okay. Let's give it a second to unfreeze. He's back.
THE WITNESS: Yeah. I'm -- I'm sorry about that. It froze and it dropped me off. I'm not

Page 192

sure what's going on with the connection, but I -- I hopped right back in.
BY MR. BECKER:
Q Okay. So just to clarify the record, this is merely a post that you posted through your X account. Correct?
A Yes. This is a response, I believe. Yes.
Q It looks like a response to Logic is Dead asking "Why isn't USA Wrestling doing anything?" Correct?
A Correct.
Q Okay. And you say that you knew -- people knew for a while and treaded lightly. Correct?
A Yes.
Q What did they know?
A I mean, that reflects my perception and opinion about, again, the climate of discussion of wrestling community prior. It wasn't specific. I was just commenting on what I believed to be, you know, prior statements that I saw online about people being scared of litigation and other lawsuits being threatened and filed.
Q And you say it's because of that person's sxl orientation. What does that mean?

Page 193

A I -- I really don't know. I mean, I'm going based off of what commentary I saw online, and I -- I believe I said, "Which isn't the issue."
Q Well, I just -- first of all, sxl means what? Sexual?
A Yes. It does.
Q So you're referring to his sexual orientation?
A I'm saying it's not the issue.
Q What does that mean, it's not the issue?
A Saying, like, that's not the issue. Saying his sexual orientation, whatever it may be, is not the issue. It's not an issue.
Q But the sentence before says, "Everyone is scared to get sued because of that person's sexual orientation." What does that sentence mean?
A Again, I believe it is based on other information that was circulating publicly. There was a lot of chatter about why people are scared of lawsuits and things like that and previous litigation.
And people think that -- you know, I -- it -- it may -- again, this was over two years ago, so I can't say specifically. But it has to do with, you know, that's my opinion based on information that was

Page 270

Q Stan Knox?
A No. I don't recall speaking to that person.
Q Jim Littlejohn?
A No. I don't recall speaking to that person.
Q Pete Isais? I-S-A-I-S.
A I don't recall speaking to that person.
Q Gary Abbott?
A No. I don't recall speaking to that person.
Q Jason Bryant? B-R-Y-A-N-T.
A No. I don't recall speaking to that person at all.
Q Tony Rotundo?
A I don't recall speaking to that person at all.
Q Matt Storniolo? S-T-O-R-N-I-O-L-O.
A No. No. I don't recall speaking with that person.
Q Dylan Ryan?
A No. I don't recall speaking to that person.
Q Ryan Haley? H-A-L-E-Y.
A You were breaking up. Can you please repeat that last name? I got Ryan.
Q Ryan Haley.
A What was the name? Ryan?

Page 271

Q Ryan Haley.
A Can you -- you froze there.
Q Ryan Haley.
A Can -- can you please -- you froze when you said, "Ryan." I didn't get any last name and it froze.
Q Haley. Ryan Haley.
A You said -- okay. No. I don't recall speaking to that person.
Q Gavin Kurtz? K-U-R-T-Z.
A No. I don't recall speaking to that person.
Q Tony Clarke? C-L-A-R-K-E.
A No. I don't recall speaking to that person.
Q Kevin English?
A -- virtual connectivity interruption -- recall speaking to that person.
Q Kim Hernandez. Can you hear me?
A Yes. I -- the last one was Kevin Lush, you said? I said I don't recall speaking to that person.
Q Kevin English.
A Oh. No. I don't recall speaking to that person.
Q Kim Hernandez?
A I don't recall speaking to that person. No.

Page 272

Q John Davidson?
A I don't recall speaking to that person.
Q Joseph Corsini?
A Joseph Corsini did message me. I believe during the suit he reached out to me just asking about the suit in general. Joseph Corsini. I believe that he produced that message.
Q Is that the extent of your communication with him?
A Yes. We never -- we never talked after that.
Q Are there any other third parties who you have discussed this case with that we haven't discussed today?
A No. I don't recall any other third parties.
Q Has anyone told you that they've removed Mr. Gharavi from an event because of what they saw online?
A No.
MR. BECKER: All right. Let's go to Exhibit 18, please. Page 48.
(Exhibit 18 was marked for identification.)
//

Page 273

BY MR. BECKER:
Q I'm going to show you what we're marking as Exhibit 18. These are bates stamped Gharavi 2319 through 2326. These are four Twitter posts posted between January 1st and 3rd of 2024 and archived on January 4, 2024, via Page Vault. Looking at these posts, you posted these on X. Correct? You
A That is correct. Yes.
Q Do you see the timestamps on these captures? Go to the first page. This is the first one. Another one. Say "He was kicked out of Midlands. That is not enough." See that post? I think we looked at that a little earlier, too. Here's another third one from January 3rd and then the fourth one from January 1st. Do you see all those timestamps?
A I do see the timestamps. Yes.
Q So these are posts that were made by you around 2:09 in the morning to 2:23 in the morning on January 1st and then at 3:49 p.m. on January 3rd based on what we just looked at. Correct?
A Correct.
Q Do you know what Page Vault is?
A I don't know what Page Vault is.
Q Okay. It's a professional archival service

that creates admissible captures of web content. Someone used Page Vault to archive your tweets here on January 4th. Do you see that? If you look at the Page Vault page there? Do you see this first page here from Page Vault?
A Yeah. I'm reading it now. Yeah. I see that first page.
Q These posts, they're no longer on your Twitter account. Correct? You deleted them?
A Again, I don't recall. But in the normal course of page management, I'm -- I'm not sure.
Q Do you know when you deleted them?
A Again, it would've been prior to any litigation or anything like that. I don't know exact dates.
Q Well, you knew that on January 4th we looked at Mr. Gharavi who made a public statement about suing over these statements. Correct?
A I wasn't aware of his statement.
Q Well, you deleted these the same day Mr. Gharavi made that statement. Is that a coincidence?
A I -- I said I don't even recall when I -- I deleted them. I just know it would've been prior to



being served. So no. I -- I don't agree with that characterization.
Q You were served with the complaint when? On March 8, 2024? Is that right?
A No. I don't think I was served 'till -- I don't know the exact date. It was later in March, I think. There was a couple attempts at service, but they didn't actually serve me.
I -- I wasn't actually served 'till later in March I don't think. They didn't actually serve me or present me with anything. They said that they tried to prior, but yeah. I don't know the exact date.
Q We did look at a post earlier, though, where you made reference to the complaint. The "little buddy" post. "Ha ha. Little buddy."
A No. That was prior to me being served. Yeah.
Q Right. But you were aware at that time that you were sued as a defendant in that case. Correct?
A I wasn't aware of the specifics. I only saw what was -- what was online there. I wasn't aware of -- of the nature of it.
Q But you --
A I wasn't aware. I wasn't served yet, so I



wasn't aware of -- someone just showed me that online.
Q You knew who Nima Gharavi was the day that you got sued. Correct?
A I got served in late March.
Q You're missing my point. You knew who Nima Gharavi was at the time you posted this post. Correct?
A I knew of him.
Q Well, you make reference to "Midwest Wrestle guy" and all the posts that you made about him predated this post. Correct?
A I -- yeah. I'm not sure what you're getting at, but yes.
Q Mr. Mineo, you posted a number of posts specifically about Nima Gharavi and Midwest Wrestle in January of 2024. Correct?
A That is correct.
Q And in March of 2024, you posted this post saying, "Hey. Look, everyone. The Midwest Wrestle guy is suing half of the wrestling media people." Correct?
A Yes. That was, I believe, a couple weeks prior to me being served for the actual lawsuit. So it was just what was publicly available online that I



mentioned there. Yeah.
Q Right. And then you looked down below and you see there, defendants are listed and your name is amongst the defendants. Correct?
A I'm sorry. You were breaking up there again. You said that I --
Q You see your name listed there as one of the defendants?
A Can you say that again?
Q You see your name listed there as one of the defendants. Do you not?
A That was a screenshot, I believe, or something like that. I -- I do see that.
Q So you went and found this docket entry identified therein as Mr. Gharavi filing a lawsuit against a number of people including yourself. You screenshotted it and you put it on X. Correct? Or I'm sorry. In the Wrestling Room. Correct?
A I don't recall screenshotting it. I think someone may have sent it to me. I just don't recall the details. I don't think I screenshotted it myself. So it was just circulating. I believe someone -- someone may have posted it publicly, the screenshot, on X. I don't recall the details. But I didn't -- I

Page 278

don't believe I -- I screenshotted it myself. No.
Q Okay. But you did get notice of this before you were served. Correct? This lawsuit?
A No. I didn't get notice of it before I was served. I saw the screenshots, so I -- I'd never been in a lawsuit like I had mentioned earlier. So I don't --
Q I think you're missing my point. You were made aware of the fact that you were a defendant in a lawsuit filed by Nima Gharavi as of the date you posted this on -- in the Wrestling Room forum. Correct?
A I was aware that that was a possibility. I had no idea the legitimacy because it was a screenshot.
Q But it does say, "he's suing half the wrestling media people." Correct?
A Yes. It does.
Q Okay. You eventually were served and you received the complaint. Correct?
A Yes. I was.
Q And you read it. Correct?
A I'm sorry. You were breaking it up again. Can you --

Page 279

Q You read the complaint. Correct?
A Once I was served, I did. Yes.
Q When you received the complaint, you knew at that time, again, that you were a defendant in a lawsuit. Correct?
A Once I received the complaint in late March, yes.
Q And you knew you were being sued for defamation. Correct?
A Once I received the complaint. Yes.
Q And you knew that lawsuit was about your social media posts. Correct?
A Correct.
Q When you realized a lawsuit was pending and you were identified as a defendant as referenced here, here on the Exhibit 17, did you understand the duty to preserve evidence?
A As I stated, I didn't become aware that I was being sued until I was served a lawsuit.
Q So you --
A So yes. I understand the duty -- preserve evidence.
Q And you believe that duty only exists when you're served. Is that correct? Is that what you're

Page 280

saying?
A No. That --
THE REPORTER: I didn't get -- I'm sorry, Jeff. I didn't get your -- let's back up. Okay. Yeah. "And you believe that duty only."
BY MR. BECKER:
Q Your duty to preserve evidence only exists as of the date you're served with a lawsuit?
A No. As of the date you're aware that you're officially being sued in an official capacity.
Q So it's your belief that your duty to preserve evidence doesn't exist as of the date that you may be aware a claim might be filed against you?
A I -- I was not served. I didn't have a formal notice and I did not understand myself to be under any preservation obligation. I wasn't served yet.
Q And again, you're basing everything you're saying on the date of being served and nothing else?
A No. I'm basing it on the official capacity of a lawsuit, and that's when I understood preservation and -- and everything that it entails. So.
Q So you believe deleting this evidence was

Page 281

okay because you hadn't observed yet evidence? Is that what you're saying?
A I mean, I don't even recall deleting any evidence, so I don't agree with that characterization.
Q It's not online anymore, sir. It's been deleted. For whatever reason you deleted it and I'm asking you, are you saying that you believe it's okay that you deleted it even though you were aware of the fact a lawsuit had been filed?
A I'm saying I wasn't served litigation.
THE REPORTER: "Aware of the fact"?
BY MR. BECKER:
Q That a lawsuit was being served and filed against you or was going to be filed against you as referenced in Exhibit 17?
A Yeah. I can only testify to what I knew at the time. I had not been served. I had not been served yet at this point.
Q Okay. So the timestamp on this post here says it was posted 27 minutes after the lawsuit was filed. How did you learn of the lawsuit that quickly?
A Again, based on publicly available information -- this was spread around the internet. So publicly available, circulating information that I

Page 282

saw at the time is how I was aware of the potential.
Q And you posted it immediately. Right?
A I -- I don't recall when --
Q Less than 30 minutes after -- within 30 minutes of the lawsuit being filed, you posted this?
A I -- I don't recall exactly when it was filed. I'm not -- I'm not understanding. It says it's 27 minutes. My post was posted 27 minutes prior, so I'm not sure. I don't agree with that characterization.
Q You posted a screenshot here of the case caption. correct?
A I posted a screenshot of what was circulating online publicly by other sites.
Q Which is the case caption?
A Yes. Correct.
Q It's got a case number. It's got a file date there, too. Do you see that?
A Yes. I do. Yeah. I see -- I see the file date.
Q It would appear to me this was more than a possible lawsuit. It's a lawsuit with an actual case number. Correct?
A I -- again, I -- I'm not aware until I get

Page 283

served of the official capacity. That's --
Q Yet you publicized this to all of the members in the group here that --
A It was already publicized and being circulated. So that was my opinion based on what was circulating at the time.
Q You circulated it further. Correct? You brought it directly into the Wrestling Room group. Correct?
A Yes. I did. And I was not served yet. I didn't receive a litigation hold. I did not understand myself to be under legal preservation obligation at the time.
Q Yet you were happy to publicize the lawsuit in the Wrestling Room group. Correct?
A I -- no. I wouldn't say I was happy. I just -- an opinion based on it.
Q But the post is no longer on Facebook. Correct?
A I -- I can't speculate on that. I'm not sure. I would have to check.
Q You deleted it within 72 hours out posting it. Didn't you?
A I don't recall when or, you know --

Page 284

Q You knew -- you deleted this post knowing you were a defendant in this lawsuit as referenced on Exhibit 17. Correct?
A No. That's not correct. I hadn't been served yet and I hadn't been served of this suit yet for another three weeks, I think. Or two. A couple weeks.
Q And in this post, you say, "or former ref since he's not allowed to ref many places anymore." Correct? Do you see that post, that's that statement?
A Yes.
Q That's you continuing to spread the allegation that he's lost his credentials. Correct?
A That was my opinion based on what I was told and publicly circulating at the time.
Q Okay. You were gloating about his career damage. Weren't you?
A No. I wasn't.
Q You wrote "people caught onto what he was doing and started talking about it." Correct?
A No. It was just my opinion.
Q It's your opinion. It's not fact, verifiable statements that people were catching on to what he was doing and talking about it?

Page 285

A That was my opinion based on information that had been circulating for months and months and months prior to my statements.
Q This was not you justifying your campaign to exile or vanish Mr. Gharavi?
A No,
Q You weren't saying here that you were essentially correct to expose him?
A Nope. No. That's not what I saying.
Q You wrote "Even suing" -- you said, "Even suing John" -- okay. Go ahead. That's fine.
THE REPORTER: Wait. We didn't get his answer, Mr. Becker.
BY MR. BECKER:
Q "No. That's not what I'm saying." Is that what you said, Mr. Mineo?
A I said no. That's not what I was saying. I don't agree with that characterization.
Q Okay. You did write here "Even suing 25 John Doe Twitter burner accounts. Ha ha. Good luck, little buddy." Correct?
A That was my opinion. Correct.
Q You were mocking the lawsuit. Correct?
A No.

Page 286

Q "Ha ha" doesn't show that you found it funny?
A That's -- it was my opinion.
Q And wasn't your opinion that the lawsuit was funny?
A No. That wasn't.
Q "Good luck, little buddy." Isn't that condescending?
A I can't speak on that. Again, it was my opinion at the time.
Q You added a laughing emoji. Correct?
A Correct. There is a laughing emoji.
Q You added a laughing emoji. And then looking at the comments, Jeffrey Lee, who's also an admin in your group, commented "Pathetic pedo." Correct?
A I can't speak on what someone else commented. I'm not in control of his comments.
Q You can speak to the fact that it's on the thread. Correct? You see it there?
A Yes. And again, I can't speak on other people's comments. There's several admins. There's several admins with deleting privileges. I can't speak on those comments. I -- it's not my comment, so

Page 287

I'm not sure, you know.
Q Let's be clear about the timeline here. On March 8th, you received word that a lawsuit had been filed. Correct?
A I didn't receive service, so I saw circulation.
Q Right. I didn't ask you if you received service. You received information that indicates a lawsuit had been filed. Correct?
A I received information at a potential -- yeah.
Q Okay. And in that post, you're referenced here as a defendant. Correct?
A Correct.
Q You posted about the lawsuit on March 8th. Correct?
A I posted my opinion on what was a screenshot. I was not served on March 8th. I didn't have any formal notice that imposed a preservation obligation for me at the time.
Q So all I asked you is whether you posted about the lawsuit on that day?
A I posted about what I had seen circulating,
Q And then some time between March 8th and

Page 288

11th you deleted that post?
A I -- I don't recall deleting anything. Again, I'm not the only moderator of the group, so I do not recall deleting anything.
Q Did you produce this post in your discovery?
A Yes. I believe I did in my supplementary discovery, I produced that post. Yes. From what I -- from my knowledge.
Q When we requested social media posts about this lawsuit, what did you provide?
A I provided everything that was available to me at the time and then I supplemented anything else that was -- that I could find that maybe I wasn't able to find that was in my possession. So I produced everything I had.
Q You sent us back our own PDFs. Correct?
A I -- I don't know. I -- I sent a -- quite a bit. I believe 80 pages of documentation and then another -- I -- I'm not sure how many pages. So --
Q Comprised within those pages were our own PDFs, correct, that were attached to the complaint?
A Those were my -- my posts that I -- that I sent back. I -- I provided posts.
Q Your posts that we screenshotted and

Page 289

attached to pleadings. Correct?
A I produced documents that were in my possession, including documents I retained. I didn't track the original source of every document.
Q You sent us a copy of the complaint we filed. Correct?
A I'm confused. I sent you a copy?
Q You didn't produce the original posts from your account. You produced copies that we had provided to you that were attached to our pleadings. Correct?
A I -- I don't agree with that characterization. I produced what I had in my possession.
Q Did you produce anything that was in your possession other than items that were received by you from us that were attached to the complaint?
A Yes.
Q What?
A I -- you'd have to look through the discovery. They would be in there. I -- I don't have an itemized list right here during the deposition.
Q You still have access to your Facebook data. Correct?

include more information?
Q To include reference to the actual information on which you were basing your purported opinions in the statements so that the people that were reading your statements would have a better understanding of what information you were privy to that led you to those opinions?
A I mean, my statements were opinions based on publicly circulating information. I didn't treat them as formal facts or reports requiring any documentation.
Q Okay.
A I can't -- I can't really speculate on what would've been helpful.
Q Protecting children requires reporting information to authorities. Right? Not organizing public outrage on social media. Wouldn't you agree?
A I don't agree with that characterization. I can't speculate on all the different ways to, you know, raise public concern.
Q If you truly believed children were in danger, why didn't you call the police?
A I mean, I -- I didn't claim to be acting as law enforcement or a mandatory reporter. I expressed



concerns and opinions in a public forum and encouraged -- I did encourage lawful reporting by those directly affected. That's what I did.
MR. BECKER: All right. I have no further questions at this time. I will point out that there are certain statements I believe that you said today that I don't think were responsive. We can address those later through motions that we need to and I reserve the right to recall you following the rulings in the court's motion to compel as necessary.
Thank you for your time today, Mr. Mineo. We can go off the record.
THE REPORTER: We are off the record at 4:06 p.m. I guess before we go off the record, I need to ask on the record about your transcript order. And I understand this is an expedited request?
MR. BECKER: Let me confirm whether we need it expedited or not. I'll let you know that.
THE WITNESS: Thank you. Am I okay to leave?
MR. BECKER: You should probably stick around for one second to let her finish the final instructions.
THE REPORTER: Yeah.



MR. BECKER: Let me have my team reach out to you to confirm whether we need the transcript on an expedited basis or not. If it's not expedited, what would you say the turnaround is right now? We don't need --
THE REPORTER: I think it's a -- I think I'm going to say 10-day turnaround.
MR. BECKER: Okay. All right. Let us verify that before you do it on an expedited basis. Okay?
THE REPORTER: But you do want the transcript? It may --
MR. BECKER: We'll order. Just -- yes. Just let me confirm if we need it expedited or not.
THE REPORTER: Okay. We are off the record at 4:07 p.m.

(Whereupon, at 4:07 p.m., the proceeding was concluded.)



CERTIFICATE OF DEPOSITION OFFICER

I, KAREN KEIM, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Karen K. Keim

KAREN KEIM
Notary Public in and for the
State of Illinois