# EXHIBIT 2

Deposition of Patrick Mineo, January 19, 2026
(excerpts: transcript pages 1–2, the pages cited,
and the reporter's certificate at 313–314)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

________________________________

NIMA GHARAVI, an individual, and
RIGHT CALL OFFICIALS, INC., an
Illinois corporation,

Plaintiffs,

v. Case No. 1:24-cv-1969

JESSICA PRESLEY; MATSCOUTS, LLC;
WILLIE SAYLOR; PATRICK MINEO;
STEPHEN KOLANKOWSKI; JOSEPH
CORSINI; IAN JAGGER; and JOHN
DOES 4-25,

Defendants.

________________________________

DEPOSITION OF PATRICK MINEO

DATE: Monday, January 19, 2026
TIME: 10:04 a.m.
LOCATION: Remote Proceeding
Northampton, PA 18067
REPORTED BY: Karen Keim
JOB NO.: 7826115

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS NIMA GHARAVI, AN INDIVIDUAL AND RIGHT CALL OFFICIALS, INC., AN ILLINOIS CORPORATION:

JEFFREY S. BECKER, ESQUIRE (by videoconference)
NICOLE O'TOOLE, ESQUIRE
Swanson Martin & Bell LLP
330 North Wabash, Suite 3300
Chicago, IL 60611
jbecker@smbtrials.com
notoole@smbtrials.com
(312) 321-9100

ALSO PRESENT:

Nima Gharavi, Plaintiff (by videoconference)

Q And you confirm that the answers to each of these allegations as you sit here today are and indeed true and correct. Right?

A Yes.

Q Okay. Now, if I look at the complaint, the third amended complaint of paragraph 5, it states "Upon information and belief, defendant Patrick Mineo is a citizen of the state of Pennsylvania and a resident of North Hampton, Pennsylvania.

"Upon information and belief, Mr. Mineo registered and authors posts on the social media platform Facebook under the username PatMineo22 and is an administrator for the Facebook call group called The Wrestling Room, which is accessed by users across the United States." Do you see that allegation?

A Yes.

Q If we look at your answer to the third amended complaint, you state that you admit that you are a resident of the state of Pennsylvania, but denied that you post under the Facebook username PatMineo22. Do you see that?

A Yes.

Q Are those your words?

A Yes.

Q You wrote that denial. Correct?

A Yes. I did. I do not author posts under PatMineo22. My name is Pat Mineo on Facebook. That's what's next to my name when I make posts or Patrick Mineo. So I don't author posts under the name PatMineo22 next to my name and next to the post.

Q So PatMineo22 is not the username that is associated with your Facebook account?

A It's not what I author posts under. So the -- the question asked if I author posts under that name, I do not. The name I author posts under is Pat Mineo or Patrick Mineo.

Q So to be clear, the allegation of the complaint states that you author posts on the social media platform Facebook under the username PatMineo22. And is it your sworn testimony you do not post under the username PatMineo22?

A Yeah. I just -- I -- I'm sorry. I may need a little bit of clarification because when you stated "author posts," that would mean what's next to my name -- name when I post. Correct? Or are you speaking about hyperlinks and things like that?

Q No. I'm looking specifically at the allegation number 5 to the third amended complaint,

A djpatronmineo@facebook.com is an email from college that I used when I was a DJ. So that is the only other email I'm familiar with.
Q Okay. And you have no idea how these other ones got listed as registered email addresses on your account?
A No.
Q Now, again, you control the PatMineo22 Facebook account. Is that right?
A Yes.
Q And this account was registered in March -- on March 15, 2006. Correct?
A Yes.
Q You've had this account for nearly 20 years?
A Yes.
Q So the court's official records show that your email is listed as patrickmineo22@gmail.com. Correct?
A Correct.
Q And Meta's records show that same email controls the PatMineo22 Facebook account. Correct?
A Yes.
Q Okay. Now, again, in your sworn answer, you denied posting under PatMineo22, but it sounds like

A Wrestling matches.
Q No more specific than that?
A I don't recall specifics regarding exactly what I watched in the past.
Q We were talking about Facebook a few minutes ago and your understanding of how Facebook works. You also understand how posts can be shared and amplified on Facebook. Is that right?
A I understand how they can be shared.
Q Give me one moment. Are you an administrator of the Facebook group called the Wrestling Room?
A Yes. I'm one of three administrators.
Q Who are the other two?
A Jeffrey and Joseph.
Q What are their last names?
A Jacobs and Swirble.
THE REPORTER: You're going to have to repeat or spell those names for me, please.
BY MR. BECKER:
Q Yes. Why don't you go ahead and state the full names and spell them so that the court reporter can have an accurate record?
A Jeff Jacobs. Jeff, J-E-F-F J-A-C-O-B-S.

Joe Swirble. J-O-E S-W-I-R-B-L-E.
THE REPORTER: Thank you.
BY MR. BECKER:
Q Did you create that group or did one of the other two administrators create that group?
A I created it.
Q When did you create it?
A Late 2019.
Q Approximately how many members are in that group?
A Approximately 80,000 plus, perhaps.
Q It's one of the largest wrestling groups on Facebook. Correct?
A I can't speculate on other groups.
Q Do you know any groups that are larger than this one?
A Yes. I do, actually. Yes.
Q Which groups are you aware of that are larger than this one?
A I recall a group called -- that was called Wrestlers Only that -- that was -- was -- larger. Yeah.
THE REPORTER: Again, could you -- could you repeat that name?

Q What is the purpose of the Wrestling Room group?
A Wrestling community. Just for people to talk about wrestling.
Q What are the types of individuals that are members of this group?
A I can't speculate on all the different types of individuals.
Q You can probably have some knowledge, do you not, of some of the types of individuals that are part of this group. Right?
A I can't speak for other people and how they identify.
Q I'm asking what your personal knowledge is, sir. Do you know if there's any members of the group that are parents of wrestlers?
A Yes. I'm sure there is. Yes.
Q Okay. And are members of the group also likely Wrestlers themselves?
A Yes. I'm sure.
Q Wrestling fans like yourself?
A Yes.
Q Wrestling coaches?
A Yes. I'm sure.

Q When you raise a concern about things that are relevant to the wrestling community within this group, do you believe the members take it seriously?
A I can't speculate on how members perceive posts.
Q Would you say that you're a community leader?
A No. I wouldn't identify myself as that.
Q Why not?
A Because I can't deem myself a leader in the community.
Q Do you believe people trust your judgment on wrestling matters in the wrestling community?
A I can't speak for other people's trust or judgment.
Q I'm asking if you believe these people do trust you?
A I can't speak on if they do. Do I believe that? It's hard to say because again you're asking me something personal. If I believe what someone else thinks or feels, that's not something I can speculate on.
Q Do you have an X account?
A Yes.

Q What's your username in your X account?
A MrPatMineo.
Q How many followers do you have on X?
A Around -- around 40,000.
Q How long have you had this account for?
A I've had the X account since -- I'm going to say 2009. It served as an account for my DJ profile at first and then I simply changed the name probably somewhere around 2015 to 2017, maybe. So it's the same account I used to have when I was a DJ. I just changed the name.
Q Is your account public?
A Yes.
Q Would you say you're also an experienced X user?
A Yes.
Q And you understand that tweets can be retweeted and reach large audiences?
A I understand the dynamics of X.
Q Do you agree with my statement?
A They can reach audiences. I can't assume the gravity of what they reach.
Q You agree first that an individual can retweet your tweets. Correct?

Q Are there any other email addresses that you have used over the last five years?
A I named earlier my email that I had previously from college, djpatronmineo@facebook.com. That's the only other email that has been tied to anything. And then I brought everything to my new email, which was created maybe five, six, seven years ago, patrickmineo22@gmail.com.
Q What about phone numbers? Any other phone numbers that you've used over the last five years?
A No.
Q And then you said earlier you derive some income from X from ads. About $500 a year?
A Not a year. Last year was the first time I derived income and it was approximately $500.
Q Okay. Do you derive any other income from any other social media platforms other than X?
A No.
Q Do you know who the plaintiff in this lawsuit, Nima Gharavi, is?
A Now, I do. Yes.
Q When did you first become aware of Nima Gharavi?
A Approximately, maybe -- to my knowledge,

January 1st or December 30th. Basically, when there was public speech about him. That's when I became aware of him. I didn't know of him prior in particular.

Q We're going to look at some posts that you posted around that time and those date stamps will give you some more confirmation as to this. But are you basically saying that you did not know who he was prior to the date around which you made those posts?

A Yeah. I wasn't aware of who he was exactly. No.

Q When did you first become aware of Mr. Gharavi's Midwest Wrestle YouTube channel?

A I -- I don't recall. Around that time, perhaps.

Q What caused you to become aware of Mr. Gharavi or his YouTube channel?

A I saw online that there was public controversy of a lot of people who were expressing, you know, opinions and things about his -- about his channel.

Q Did anyone personally tell you about it?

A No. It's all public information that I saw when I logged on.

you're basing your understanding of what he does within the wrestling community?
A Yes.
Q So when you first learned about Midwest Wrestle, what did you do?
A I -- I mean, when I first learned about Midwest Wrestle, I read comments all over the internet as far as X and just basically read more about Midwest Wrestle.
Q And where did you read more about Midwest Wrestle?
A On X. There was a lot of posts, like I said.
Q These are posts -- those are posts that were publicly authored by third parties, right, on their user accounts -- on their X accounts?
A Yes. Correct.
Q So you read what others were saying about Midwest Wrestle. Is that correct?
A Yes. Correct.
Q Did you at that time visit the Midwest Wrestle YouTube channel?
A I believe I may have, but I'm not sure the extent of that.

third parties other than Mr. Gharavi himself. Correct?

A Yes.

Q Do you have any knowledge as to what Mr. Gharavi's relationships are with parents or coaches or tournament organizers within the wrestling community?

A I can't speak on his relationships. No.

Q Nor could you speak on those relationships prior to January 1, 2024. Correct?

A No.

MR. BECKER: What's the next exhibit number? Six?

(Exhibit 6 was marked for identification.)

BY MR. BECKER:

Q I'm going to show you what we're marking as Exhibit 6. It's a one-page document bates stamped Gharavi --

MR. BECKER: And Karen, for your purposes -- you'll probably get it from the caption. But it's G-H-A-R-A-V-I whenever I say Gharavi.

BY MR. BECKER:

Q It's Gharavi 2324, which is a post from your

X account dated January 1, 2024, at 2:09 a.m. Do you see this?

A Yes.

Q Okay. This is something that you personally posted under the username MrPatMineo. Correct?

A Yes.

Q You authored this post. Correct?

A Yes.

Q And this post is made in reference to Nima Gharavi. correct?

A Yes.

Q And you also specifically identify Midwest Wrestle in this post. Correct?

A Yes.

Q And you tag Mr. Gharavi's account here. Correct?

A Yes.

Q I'm going to read the post out loud for the record. So it says, "Yeah @Midwest_Wrestle. You are a vile human being and need to be exiled far away from the support of wrestling and any tournament, practice room, school, and children in general.

"You know what you are doing and the fact that you are allegedly a certified referee in Iowa is

scary. You need to be investigated by authorities ASAP." Did I read that accurately?
A Yes.
Q What did you mean by "exile"?
A That was an expression of opinion that I made in response to all the publicly available information and the public discussion that was ongoing.
Q Well, what I'm asking you is the term "exiled" itself. What does that mean to you?
A That -- it was an emotional reaction at the time.
Q Exiled means permanently removed. Correct?
A I am not going to speculate on what exiled means.
Q Well, I'm not asking you to speculate on what exiled means. I'm asking you to tell me what you meant by the word "exiled" in this document. Not why you posted the word "exiled." Not whether you had opinions on Mr. Gharavi.
I'm asking right now, so that we're on the same page, what you personally meant when you wrote the word "exile" there. What did you understand that term to mean?

A What I understood that term to mean?
Q Yes.
A I used it in more of, like, a -- I would say, like, a colloquial sense, meaning social criticism or loss of community support. Not formal punishment, removal, or legal action.
Q What does the word "exiled" mean?
A I -- I don't -- I don't have a definition for you for "exiled."
Q I mean, did you write this yourself or does someone write it for you, sir?
A I -- I wrote it myself.
Q Okay. And you chose to put the word "exiled" there, which I assume means that you've learned it at some point in your education. And I'm asking you to tell me now what you understood the word "exiled" to mean when you wrote it there. I'm not asking you to put out all the fun words around defending a defamation case. Right now, I need to know when you use the word "exiled" what you meant?
A Yep. So to me, exile, it's -- it's a colloquial term. I -- I meant it in social criticism or loss of trust within the community. So not formal punishment, removal or legal action.

Q You said, "You need to be investigated by the authorities." What did you mean by that?
A What did I mean by he needs to be investigated by the authorities, you're asking?
Q Right.
A I was expressing my opinion.
Q Okay. And your opinion was that he needed to be investigated by the authorities. Correct?
A That was my opinion. Yes.
Q Okay. What authorities did you mean?
A There was no specific authority.
Q Police?
A No specific authorities. Just general statement.
Q Well, do you put the word out there. What did you want people to understand that to mean when you wrote it?
A It was my opinion.
Q Mr. Mineo, I'm fine if you want to sit here today and try to suggest that that statement is an opinion and I know why you're doing that. But just like the word "exile" has a definition that must have been in your mind when you were making a statement, so too should "authorities." And I'm asking you, what

schools. Right?
A Correct.
Q And he should not be anywhere near children. Correct?
A Correct.
Q This post got significant attention. Didn't it?
A Looks like 24 reposts.
Q Got 214,000 views. Right?
A Yes. That is correct. And I believe it was a quote tweet of a previous concern posted by a Michael Boyd.
Q Right. But your post to that comment by Mr. Boyd received 214,000 views. Correct?
A Correct. That's what it says.
Q And you posted this at 2:09 in the morning?
A That's what it says. Yes.
Q So what did you intend for your followers or other users to believe when they read this statement?
A Could you repeat that question, please?
Q What did you intend for your followers or users of X that reviewed this post to believe when they read your statement?
A I didn't intend for them to believe

users saw. Correct.
Q Okay. So a user that's reading your post indicating that Mr. Gharavi needs to be investigated by authorities. The only information that you're aware of that any user would've seen, unless they did more of their own investigation, is what's right here in front of us right now. The Boyd post and your post. Correct?
A Correct.
Q And you said earlier you don't have any evidence of your own to prove what Mr. Gharavi was actually doing in relationship to what's being alluded to here in these posts. Correct?
A Like I said, I was reacting to public controversy that predated me and expressed my opinion based on what was publicly observable.
Q Correct. You didn't actually verify the veracity of any of the statements that you saw from other third-party posts. Correct?
A I did not conduct an independent investigation. I relied on information that was available publicly and discussed and reported before my comments.
Q And you did not verify the veracity of any

of the statements contained within your posts before you posted them on social media. Correct?

A I did not conduct a -- an independent investigation. No.

Q Okay. I'm going to show you what we're marking next as Exhibit 7, which is bates stamped Gharavi 2326.

(Exhibit 7 was marked for identification.)

Let me know when you have a chance to see this.

A Yes. I can see it. There was a little -- okay. It's clearing up now. There was blue print over it. But yes. I do see it.

Q You authored this post?

A Yes.

Q Can you read it for me?

A "He was kicked out of Midlands. This is not enough. He's using our sport and access for something very evil."

Q Okay. This post is also made in reference to Nima Gharavi. Correct?

A Correct.

Q And this was posted from your X account on

January 1, 2024, at 2:10 a.m.?
A Yes. Correct.
Q What was your intention making this post?
A Again, it -- it was my opinion based on the publicly circulating information at the time.
Q Now, this post, unlike the other one, doesn't have a post it was commenting on. Correct? It's just a -- your direct post onto X?
A Yes. That is direct post. Yep.
Q Okay. And were you at the Midlands Championships on December 30, 2023?
A No. I was not.
Q Okay. How did you know he was kicked out of Midlands?
A I saw several posts about it predating mine online that said he was kicked out of Midlands.
Q No one personally told you this?
A No. I -- I read the posts online.
Q Right. So you saw it online from other posts and that's what you based your statement on?
A Yes. I saw the post predating mine online regarding Midlands and all the other controversy and that's what I based it on. Yes.
Q Right. And I'm just making sure it's clear.

and his access for something evil. That was your opinion? Is that right?

A I never spoke about anything that I reviewed.

Q No. You don't. You don't say what you reviewed here. Correct?

A No. I don't.

Q I'm going to show you what we're marking next as Exhibit 8.

(Exhibit 8 was marked for identification.)

And this is bates stamped Gharavi 2322.

A Two, two.

THE REPORTER: The number, please?

MR. BECKER: 2322.

THE REPORTER: The number of the exhibit.

MR. BECKER: I believe it's Exhibit 8.

THE REPORTER: Thank you.

MR. BECKER: Of course.

BY MR. BECKER:

Q This is a post from your X account dated January 1, 2024, at 2:23 a.m. Correct?

A Correct.

Q And you authored this post?
A Yes. Correct.
Q And in this post you say, "He's framing up these videos and then pushing them out to evil places, resulting in millions of view. There's serious red flags. He has to be banished from the sport. Sickening." Did I read that correctly?
A Yes. You did.
Q Those are your words. Correct?
A Yes. They are.
Q Now, you say, "He's framing up these videos." What does that mean?
A That was just my opinion based on what I had seen prior in public discussion.
Q Your opinion or your observation of what he was doing?
A My opinion based on what I had seen prior and the posts that I had prior commented on regarding thumbnails and things like that.
Q So what does the word "framing" mean there? I just don't understand it.
A That was my opinion.
Q No. Mr. Mineo, what does it mean "He's framing up these videos"?

Q Again, you provide an opinion here without providing any of the information that you relied upon to come up with that opinion. Is that correct?
A I don't agree with that characterization.
Q What is wrong with that characterization? What part of that characterization is inaccurate?
A You're making an assumption.
Q Do you provide any information in this post to identify what your opinions are based on?
A No. I don't. But I don't even provide -- provide much identifying information at all in this post. There's no -- no names. There's no tags. There's nothing in it.
Q But you already testified that this was about Mr. Gharavi. Correct?
A Correct.
Q I'm going to show you what we're marking now as Exhibit 9.
(Exhibit 9 was marked for identification.)
The bates stamp on this is Gharavi 2335. This is a post from your Facebook account dated January 1, 2024, at 10:24 a.m. Correct?
A Let me just read that. Yes. Correct.

Q You authored this post. Correct?
A Correct. Yes.
Q And again, you're referring here to Nima Gharavi and his company, Midwest Wrestle. Correct?
A I'm referring to the YouTube channel.
Q You tag Midwest Wrestle. Correct?
A Yes. Correct.
Q Which is understood to be Nima Gharavi's YouTube channel. Correct?
A Yes. Correct.
Q Okay. Let me read the beginning of this post. It says, "Wrestling community, if you have children in the sport, especially in the Midwest area, go to @Midwest_Wrestle's YouTube channel and search their name." That's what you say. Correct?
A Yes.
Q That's how you started the post?
A Yes.
Q And again, you directly tag Midwest Wrestle again. Correct?
A Yes.
Q And you specify here, "especially in the Midwest area." Correct?
A Yes.

didn't know exactly where he officiated. No.

Q In this post you told people to search for their children's name on the channel. Correct?

A Yes.

Q Then you said, quote, "If there are any videos of them try to get them removed from this sick person's channel ASAP." Correct?

A Correct. That's what I stated.

Q You called him a sick person?

A Correct. That was my opinion.

Q And in your opinion he was sick? What did you mean by that, he was sick?

A Just my opinion.

Q Explain what that means, your opinion.

A Yeah. It -- it was my opinion based on the publicly circulating information that I observed.

Q You meant "perverted." Correct?

A No. That's not what I meant.

Q You meant "pedophile"?

A Nope. No.

Q Well, you're saying here in this document quote, "There is something very wicked at work." Correct?

A Yes.

factual claim about specific websites. I expressed concern based on what people were already discussing publicly. So there's no specific claim.

Q You alluded to pornographic websites by referring to them as "evil places." Didn't you?

A No.

Q Okay. You say here "He should be investigated by the IHSA." Correct?

A Correct.

Q And what do you base that statement on?

A That was just my opinion, again, about what governing bodies should consider. I have no authority over any of them or their decisions.

Q You said here that he should be investigated by the IHSA. You even tag the IHSA. Don't you?

A Yes. Correct.

Q So you're calling for action from the IHSA that he be investigated. What was he -- what were you suggesting he be investigated for?

A I just thought that they should look into some of the public concerns.

Q You don't list the public concerns here, though. Do you?

A No. I don't.

Q You just say something's wicked at work and you should have the IHSA look into revoking this person's referee license. Correct?

A Correct.

Q You say, "He cannot be allowed in a gym on a mat next to these kids." Correct?

A Yep. That was my opinion based on the information publicly circulating.

Q Okay. Again, you make a statement here asking the IHSA to revoke this person's license and in the very next sentence say it's your opinion he should not be allowed next to kids. Correct?

A That was my opinion, that they should look into it based on what was publicly available in the concern in the wrestling community.

Q Okay. Take a moment to look at this post. Can you tell me where in this post you reference that you're making this statement based upon your review of publicly available information in the wrestling community?

A I'm telling you that right now. You asked me what I meant by --

Q I'm asking you. Do you say that in your post, though?

A No. I don't.
Q You leave the information that you're basing this on out of the post. Correct?
A I don't agree with that characterization.
Q Show me where in the post that information is, then?
A The information is not in the post.
Q Okay. So you make opinions -- you state opinions, according to you, in this post and you do not provide the information upon which that opinion or those opinions are based. Correct?
A I don't agree with that characterization, either.
Q Do you put anywhere in this post the information that you viewed that resulted in you raising the opinions that you say you make in this post?
A No. It was a commentary post, not in any sort of official report. I wasn't laying out any evidence or findings. I was reacting to information that was circulating publicly at the time.
Q So that's an interesting statement you made. Evidence and findings. Did you have any evidence and findings prior to making this post?

A I did not conduct my own independent investigation. I said I relied on information publicly discussed and reported before my comments.
Q Understood. And you don't put any findings or evidence of your own, because you didn't conduct an investigation into this statement. Correct?
A Correct.
Q And you don't put any of the publicly available information that you relied upon in coming up with these opinions in this post, either. Correct?
A That is correct. Yes.
Q You say that he can't be allowed in a gym next to kids. Was this also based on the publicly available information that you reviewed?
A Yes. Correct.
Q And again, that publicly available information that you're referring to today is not made reference to. And you do not make reference to it or listed out in this post. Correct?
A Correct.
Q You say in this post as well, his videos are quote, "def being peddled somewhere." Do you see that?
A Yes. I do.

Q The publicly available information that you reviewed, the other sources, the posts that you reviewed prior to making this post. You don't incorporate or reference in this post any of those statements. Correct? You make your opinion based on what you're saying you saw before, but you don't include any of that information in this actual post. Is that fair to say?

A Correct. An opinion does not require me to list the underlying information in the post. No. I didn't.

Q Do you have any evidence that Mr. Gharavi was paid any money in return for his videos being peddled to pornographic websites?

A I -- I don't agree with that characterization. You're -- you're --

Q I just asked you a question whether you have any evidence that Mr. Gharavi was paid any money in return for his videos being peddled to pornographic websites?

A I -- I think you're making an assertion based on your own assumption and then asking me the question. So it's hard to an answer that. But no. I don't have any evidence.

Q I'm not basing this at all on your posts or anything that you've said. I'm just asking you specifically, do you have any evidence that Mr. Gharavi was paid any money in return for his videos being peddled or distributed to pornographic websites?
A No.
Q Now, if we look at the thread of comments that followed this post. I'm going to refer to them generally as Gharavi -- and let me start this -- try this again. This will be Exhibit 9. And the bates range of these documents is Gharavi 2335 through Gharavi 2352. Okay?
THE REPORTER: I'm sorry, Jeff. I believe it's 10.
MR. BECKER: Is it 10?
MS. O'TOOLE: Well, 9 was the first page, so --
MR. BECKER: Oh. You know what? I am so sorry. Actually, just to clarify for the record, what I just described is Exhibit 9. The whole thing is Exhibit 9. Wait. No, Nicole.
MS. O'TOOLE: First you marked 9 the first page.

MR. BECKER: I maybe -- I may have just marked 2335 as Exhibit 9. The entirety of what I just described is actually Exhibit 9. It's not just -- no, Nicole. That's not right.

MS. O'TOOLE: Yes. That's what -- okay.

MR. BECKER: No. Hold on. One second, Karen. Okay. So I -- yes. Exhibit 9 will actually be 2335 through 2352. I had originally referenced it only as 2335. That's the first post.

THE REPORTER: Okay.

MR. BECKER: The entirety of it, that thread, is going to be Exhibit 9. It's all part of 9. I just hadn't realized it was more than one page when I first was looking at it.

THE REPORTER: Fine.

MR. BECKER: Okay. So before we keep going, give me one second here.

BY MR. BECKER:

Q Okay. All right. Here's what I'm going to do. I'm going to back up and ask a couple general questions before I go into some of these posts before you posted this post that we've been looking at just now on Gharavi 2335, Mr. Mineo, did you contact

Mr. Gharavi to ask him for his side of the story at all?
A No. I did not.
Q Did you contact YouTube to report your concerns that you referenced in this post?
A No.
Q Did you contact the IHSA to ask about their investigation at any time?
A No.
Q Did you contact any law enforcement?
A No.
Q Did you contact the FBI?
A No.
Q You didn't do any of that. Correct?
A No. Correct.
Q Instead, you decided to post your concerns to your audience on Facebook. Correct?
A Well, not instead, but I posted -- I posted my opinions. Yes.
Q How many views did this post get?
A I have -- I have no idea. I don't think it says the amount of views.
Q How many posts -- or how many comments did this post get?

A It looks like 148.
Q And again, you tag the IHSA directly. Correct?
A Yes.
Q You wrote "@IHSA must look into revoking this person's referee license." Correct?
A Correct.
Q You specifically tagged the IHSA?
A Yes. I did.
Q Why did you tag them?
A I just tagged them. As you can see, the tag actually didn't -- didn't attach because it's a private group. So it actually didn't attach to -- to them, so they wouldn't have been able to see it. But yeah. It's -- it is @IHSA, but as they're obviously not a member of the group -- it's a private group. They wouldn't have been able to see it.
Q But you did attempt to tag them?
A Well, I did tag them here. Yeah. Yeah.
Q You wanted them to see your post. Correct?
A I -- I tagged them. It doesn't mean that I wanted them to see my post. But I tagged them.
Q You wanted them to investigate Mr. Gharavi?
A No. That's not what I said.

(The reporter repeated the record as requested.)

THE WITNESS: What -- what -- virtual connectivity interruption -- I said they should look into it and yeah. They should look into it based on the public concern.

BY MR. BECKER:

Q You say based on the public concern? Where do you say that, sir?

A I'm telling you that's -- you -- you asked what I meant by it and I told you.

Q Oh. But you didn't say that, though, based on the public concern. That's what you're saying you meant by it. Correct?

A Well, you asked what I meant by it. You asked what that meant, so I described to you what that meant.

Q Okay. So you wanted them to look into revoking his license, but you don't say here why. Is that correct?

A I stated they should look into it based on the -- it's based on the public concern that was already circulating throughout the wrestling community for days prior.

Q But again, to clarify, you don't say in your post what the reason was that you wanted them to investigate or to look into revoking his license. Correct?

A No. It -- it was my opinion based on the content -- how the content appeared and was circulating publicly.

Q You knew that Mr. Gharavi earned income from officiating wrestling matches. Correct?

A I can't speculate on his income. I did not not know anything about his income.

Q Did you know that revoking his license could end his officiating career?

A No.

Q No? That wouldn't be something that you would have knowledge of just being in the wrestling community for 20 years?

A I -- I had no knowledge of his referee -- I -- I can't speak on it. I don't have any knowledge of it.

Q But more generally, if you were to have someone's license revoked, that could end their officiating career, generally. Wouldn't you agree?

A I -- again, I cannot speculate on anything

that was done, any investigation, or what that would entail. I can't speak on his career.

Q Would you agree with me, though, that it was your opinion that you're painting here in this post that Mr. Gharavi was someone who needed to be kept away from all children?

A That was my opinion based on the -- the information circulating. Yes.

Q But again, the information circulating is not actually referenced or stated within your post. Correct?

A No. It's not.

Q Let's go to the next, Exhibit 10. Well, actually no. This is all -- this is 9. This is all 9. Okay. All right. So we're going to show you within Exhibit 9, the page marked Gharavi 2339.

So if you look at 2339, and you look below this post from Charlie Chalfant, you respond to him and say, "Charlie," you said quote, "Dude, did you watch the videos and also see the thumbnails? Every thumbnail is of a private part and he zooms in during matches. If it was just views, then it wouldn't matter: it's about the content." Do you see that?

A Yes. I do.

Q Did I read that correctly?
A Yes.
Q You authored this post?
A Yes.
Q Did you verify the veracity of the statement before posting them on social media?
A I didn't conduct an independent investigation. It was my opinion based on everything I read that was circulating prior.
Q You say here "Every thumbnail is of a private part." You're telling me that's an opinion? That's not a factual statement?
A That was my opinion based on what I saw and read online.
Q What is that? What -- isn't that a verifiable fact whether every thumbnail that Mr. Gharavi has posted is of a private part?
A I can't tell you.
Q If you and I wanted to go and look at every thumbnail that he's posted, couldn't we verify whether they're all of a private part?
A I couldn't tell you.
Q Why couldn't you tell me that, sir?
A Again, this was my opinion based on what I

Q And you were again referring to Nima Gharavi and Midwest Wrestle?
A Correct.
Q Did you produce in your discovery these screenshots?
A I -- I don't recall.
Q Okay.
A I produced what was available to me and what I had.
Q Okay. Underneath the image, it says, "Over the last week since publicity on him ramped up, he has altered some thumbnails and deleted hundreds of comments, but many are still lingering and there screenshots have been taken." Do you see that?
A Yes. I do.
Q What do you mean by "screenshots have been taken"?
A Screenshots have been taken. I mean, in the last exhibit you saw someone commented above me that thumbnails were being altered. I know you didn't mention that, but that was stated above in the -- in the thread. So "screenshots have been taken" of the thumbnails. I -- I'm guessing.
Again, this is -- this is a while ago. But

Q Okay. Did you produce any of the screenshots --
A I believe so. I have to see exactly.
Q Did you produce any of the screenshots that you took in this matter?
A I believe so. I think in my original 80-page production, there were several screenshots of the thumbnails in there, I believe. I'd have to go back and look.
Q Let's go to Gharavi 2347. Okay. If you look at this screenshot here in front of you, it says quote, "He is uploading them in evil places." Do you see that?
A Let me just widen this up. Sorry. My screen. Yes. I do.
Q You authored this post?
A Yes. I did.
Q Did you verify the veracity of this statement before posting it to social media?
A I didn't conduct any independent investigation. I just relied on information that was publicly discussed before my comments.
Q Okay. Do you have any evidence -- when you say, "He is uploading" and referring to Mr. Gharavi,

and -- community members. But to what you're saying, no.

Q Okay. And again, I'm not asking you right now whether any videos ended up on porn sites. I'm asking you whether you viewed any evidence to show or prove that he put it there. And I believe the answer to that is "No." You did not view any evidence or information that showed he put it there. Correct?

A Aside from the concerns stated in the public from the community predating me and that being mentioned which I produced in discovery, no.

Q Right. Other than other people saying that they thought he put it there, you did not review any evidence that actually showed he did it. Correct?

A No. I -- I didn't view evidence proving how or by whom the sites, the pornographic websites, where his videos were got there.

Q Well, didn't you testify earlier that he embedded his videos in pornographic websites?

A I -- I'm -- I'm confused. I think what -- what you're saying is his videos have the "M" feature on them, so that means they have the ability to be embedded on pornographic websites when you leave that "M" feature open.

BY MR. BECKER:
Q All right. We're looking at Gharavi 2349, which is still part of the same exhibit. And here you say in response to someone named Alex "And considering he's posting them in chat rooms and porn sites. Yeah." And underneath that you screenshot a link or a -- looks like a Google search of some sort to the mypornvid.fun website. Correct?
A Correct.
Q Okay. You authored this post. Correct?
A Correct.
Q What chat rooms are you referring to in this?
A I'm not sure. I don't recall the exact chat rooms.
Q Okay. But you are saying affirmatively that Nima is posting these videos in chat rooms. Correct?
A Yeah. That -- that was my opinion based on what I saw. Yeah.
Q Yes. It was your opinion based on what you saw, that he's posting videos from the wrestling matches in chat rooms. Correct?
A Yes. That was my opinion based on what I read online with the publicly circulating controversy

prior to my statements.

Q And you don't provide any information in your post here as to what chat rooms you're referring to. Correct?

A No. I don't see any specifics. It just says, "chat rooms." It doesn't say anything. It just literally -- it says, "chat rooms," so there's no --

Q It says, "chat rooms." And it doesn't provide any information about why you believe he's posting in chat rooms here in this post. Correct?

A No. It doesn't. It just says the word "chat rooms."

Q Can you name me one chat room that you were alluding to there?

A I -- I don't recall. It just says, "chat rooms" in general. It doesn't say a specific chat room at all.

Q So you can't name any chat rooms as we're sitting here today. Correct?

A I don't recall any specifics. No. It just -- again, chat room is very generic. It -- it's a generic term.

Q You never personally saw him post these videos in any chat rooms. Correct?

A Nope. It was my -- no. I'm sorry. I said, "Nope." No. it was my opinion based on, again, what was circulating and what I observed at the time.
Q Right. Can you refer me to anything in any of the discovery that shows that he posted in chat rooms?
A Again, "chat rooms" is -- is generic. It doesn't say anything specific chat rooms. It just says a chat room.
Q Right.
A I mean, any room online can be a chat room. So it's pretty generic. I mean, that you're posting a video in a forum anywhere, it could be considered a chat room. So it's -- yeah.
Q Is that what you meant by "chat room" when you posted this?
A Again, it just says, "chat rooms" and it doesn't say anything specific.
Q I'm asking you, is that what you meant by "chat rooms" when you posted this?
A It's just a general statement.
Q What about porn sites? Is that a general statement?
A No. That's based on what is below and what

I, again, publicly observed and what was already publicly available in the -- in the community.

Q Okay. So now, look. This is where we're actually getting somewhere because it looks like in regards to this post for the first time and probably a little bit earlier in the chat as well, on 2346. Right? We'll look at these both back to back.

You're actually providing some information to support your statement. Okay? 2346. Remember we looked at this post here about the, you know, the creep, once again, suggestive photos. That post. And you're showing the image of -- well, that's not what I wanted. I'm sorry. Hold on. Scratch that.

MR. BECKER: Find me the one -- I guess the one where he was -- it had mypornvid on it.

MS. O'TOOLE: 2348.

BY MR. BECKER:

Q 2348. Okay. So if you look at this 2348. We did look at this one, I believe, where you say, "He's uploading them in evil places. And then underneath that you provide a screenshot of one of his videos that looks like it's on mypornvid.fun. Correct?

A Yes. It is there. Yes.

Q Okay. And so when you refer to "evil places" in this post, is it fair to say you're referring to this mypornvid.fun website?
A Again, it's a general statement and I was showing what was already publicly circulating.
Q You were providing an example of one of the evil places you're referring to in your post. Correct?
A Yes. That was my opinion that that pornographic website with the high school wrestlers is an evil place for that to be. Yes.
Q Okay. So in this case, you're stating he's uploading them in evil places and then you're providing a screenshot to the website mypornvid.fun. Correct?
A Yep. That -- that reflected my belief at the time based on seeing the videos appear on those sites. I didn't have direct evidence of -- you know, I -- I wasn't claiming personal -- personal knowledge of the mechanism. And that was my opinion based on -- it says his -- it says Midwest Wrestle and it's on a pornographic website. So that was my opinion based on observable information.
Q And if we go to the next page, back to 2349,

Q What are the names of these notable members of the community that you're referring to?
A Again, I don't have specifics for you at this time. There -- there was a lot of commentary and I --
Q If someone was notable, wouldn't you know? I mean, who are the notable members of the wrestling community, sir?
A Yeah. Again, I don't have specifics. There was quite a bit of posts before mine regarding this matter in detail shared. I don't have specifics off the top of my head.
Q Okay. Let's go to Gharavi 2351. Okay. So here you post the top of the page, "The FBI will be handling this matter moving forward." Do you see that?
A Yes. I do.
Q That's a post that you've authored?
A Yes. It is.
Q What information did you base this on?
A Based -- based on what I was told by someone else in the community.
Q Who's that?
THE REPORTER: Lets -- let's back up a

minute. Let's back up a minute. His answer was not clear.

MR. BECKER: Okay.

THE REPORTER: So let's go back to -- the question was "What information did you base this on?"

THE WITNESS: Based on information that I was directly told by a member of the community that they reported the concern to the FBI.

BY MR. BECKER:

Q And who was that member of the community?

A Jennifer Ritacco.

Q How did she go about telling this to you?

A I believe she -- she messaged me.

Q Okay. What did she say in her message?

A I don't recall the exact verbiage.

Q Did you provide the entire message communication thread with you and her?

A I provided -- yeah. I provided what I had and I produced what I had and what was available to me.

Q Did you provide the complete thread that was in your possession?

A I provided what I had in my possession and

Q So she said they were investigating it?
A Again, that's what she said. Yes.
Q Did you do anything to personally corroborate the truthfulness of that statement?
A No. I -- I did not.
Q Had you seen any FBI documents or communications?
A Nope. I did not see any FBI documents.
Q So you had zero contact with the FBI. Correct?
A Correct.
Q And other than Ms. Ritacco telling you that she contacted the FBI, you had zero evidence the FBI was involved at all in investigating this matter. Correct?
A Correct.
Q You feel -- what was the reason you posted that comment here on social media?
A Because I was notified that Jennifer Ritacco told me she reported it to the FBI. And as I stated, she said that they were investigating it.
Q Do you think that posting this comment about the FBI investigated made it seem like official law enforcement agreed with your opinions?

statements reflected my opinion based on what was circulating at the time and what I was told.

Q Okay. And you believe that whether or not the FBI was investigating this matter moving forward is a matter of your opinion?

A No. I'm letting you know based on what I was told.

Q I understand you were told by Jennifer Ritacco that she contacted the FBI. Right?

A Yes. That she contacted them, that they were investigating it, and that they took her complaint seriously.

Q And then you took what she told you and posted "The FBI will be handling this matter moving forward." Correct?

A Correct.

Q But other than what Jennifer Ritacco told you at that time, you had no independent evidence to corroborate her statements that the FBI was actually handling this matter moving forward. Correct?

A Aside from what Jennifer Ritacco told me, no.

Q Okay. Let's turn to Gharavi 2339 and 2340 in the same exhibit. So if you look at this portion

did you have that he was reported anywhere other than the IHSA, which you reported, and the FBI?

A Again, I -- I had based on publicly circulating information prior to my statements in the community and what I was told by community members. That's what -- that was my opinion based on what I had been told and what I had read and observed.

Q Do you have any understanding of what percentage of the videos posted by Midwest Wrestle to its YouTube page included at any time thumbnails that you have described as suggestive?

A I -- I can't speculate on that. I don't know the percentage.

Q Let's turn to Gharavi 2342. So here, now you're responding to this Wendy person that commented earlier, the one we looked at that you didn't agree with. And you say here, "Wendy," quote, "You don't think this is perverted to upload the videos to pornographic sites?" Do you see that?

A Just -- I'm just opening this up. Yes. I do see that.

Q That was something you posted. Correct?

A Yes. That was a comment I posted.

Q And you then include underneath that a

screenshot, I think the same screenshot, to the mypornvid.fun website. Correct?

A Correct.

Q So you are saying to Wendy here that it appears that these videos are being uploaded to pornographic sites. Correct?

A That was my opinion, yes, based on circulating information.

Q Okay. Would you agree with me that whether something is or isn't uploaded can be verified as true or not?

A I can't speculate on that. I'm not an expert in uploading videos.

Q Okay. Would you agree with me that whether something is or is not on a pornographic site can be verified?

A I -- again, I -- I can't speculate on how things are uploaded.

Q I didn't ask about uploading. I asked whether or not it could be verified that a video is on a pornographic site. Isn't that something that could be factually verified?

A I am not sure. I'm not certain on that. Again, I'm not keen on verification processes.

Q Well, aren't you providing a screenshot of what you believe to be a pornographic site here to support your statement?

A Yes. To support my opinion, there is a screenshot of mypornvid.fun of the minors in the video. Yes.

Q And again, did you do anything to verify the veracity of your statement that this video is uploaded to a pornographic website before you posted it?

A I -- again, I didn't conduct my own independent investigation. I relied on my observations and publicly discussed information that was reported before my comments and shared in the wrestling community.

Q Let's look at another post here. Here, you post at the top of the page, "A schoolteacher? Unreal." Do you see that post?

A Yes. I do.

Q And you authored that post?

A Yes. I did author that post.

Q And you're again referring to Nima Gharavi in this post. Correct?

A Correct.

Q All right. What did you mean by this post?

Q Okay. Before you posted this post, did you do anything to verify whether or not Mr. Gharavi was actually a schoolteacher?
A Again, it -- it was based on public information that was circulating in the wrestling community at the time. I didn't independently verify that. It was publicly circulating in the community. My comment was a reaction based on what others were discussing. And it was question.
Q And other than these public posts and discussions, you have no evidence whether this statement is true or accurate. Correct?
A The question -- because there's a question mark.
Q Correct.
A I mean, a question -- again, there's a question mark. So I -- I don't have any -- I didn't do independent verification on a question.
Q Okay. Let's go to the next exhibit. Okay. I'm going to show you what we're marking as Exhibit 10, which is bates stamped Gharavi 2320.
(Exhibit 10 was marked for identification.)
This is a post from your X account dated

January 3, 2024, at 3:49 p.m. Correct?
A Correct.
Q You authored this post?
A Yes. I did author the post.
Q How many views did this post get?
A It says 36.5K views with ten reposts and two quotes.
Q Let's go to the next exhibit, which is being marked as Exhibit 11.
(Exhibit 11 was marked for identification.)
This is Ravi 2331 to 2334, which is a post from your Facebook account from January 3, 2024, as well. Do you see that?
A Yes. I do.
Q You authored this post as well. Correct?
A Correct.
Q This post includes the same substance as the X post from the same day. Correct?
A Correct.
Q Did you verify the veracity of any of the statements contained within this post before posting them on social media?
A This is a general statement to the wrestling

sit here today, hold the opinion that there is a sinister network of people that use the sport for something very bad?

A I'm not really sure how to answer that question.

Q Do you believe that there are people that are misusing information gathered and captured as footage from wrestling matches in an inappropriate manner? Do you hold that opinion?

A Again, this -- I wasn't referring to a specific identified group or organization. It was a general language to describe what I perceived as general online behavior. So there's no specifics.

Q I'm not actually asking you about the post, Patrick.

MR. BECKER: Nicole, take the post off the screen.

BY MR. BECKER:

Q I'm talking to you. I'm not asking you about the post. As of January 3, 2024. Did you personally hold the belief that there were individuals who are misusing video footage captured at wrestling matches?

A That's -- there's -- there's nothing in that

post that states that. I didn't have evidence of an organized or coordinated network. I expressed concern and opinion what -- based on what I observed online. So it's not specific towards anybody.
Q I'm not asking you about the post. I'm asking you whether you held an opinion at that time? I'm not asking about the post.
A Yeah. And I'll give you my opinion. My belief was limited to a concern about online patterns, not the existence of any defined network. Just a general statement.
Q So what was -- the network that you're referring to just now. What was that made up of? What was that made up of?
A Again, there's no -- there's no specific network. It doesn't name anybody specifically.
Q There is no network?
A No. There's no specific network. It's a general statement.
Q What statement? I'm not looking at any statements, dude. I'm talking to you about what your opinions were, not about a statement you made to the public. As of January 3, 2024 -- I don't care about the statement. I'm asking you right now.

was general language reflecting my concern. I expressed my opinion. I didn't assert the existence of an organized group.

Q You just told me that you weren't sure that you even had an opinion as of that time.

A And you're forcing me to elaborate, which I understand, and I'm trying to elaborate the best I can. No. So here's my answer. No.

Q No? You did not hold that opinion?

A No.

Q Yet you did make a statement online about a sinister network of people that used the sport for something bad, which you are describing as an opinion that you said you held at the time, despite the fact you just testified you didn't hold it? Correct?

A Again, I asserted that that was a generalized statement and I'm saying no. There was no specific -- there was no specific network. It was a generalized statement that I made.

Q Okay. So there was no individual or person that you held that opinion about at that time, yet you made a generalized statement online telling your wrestling community to beware of this sinister network of people. Correct?

Q What evidence did you have or do you have that he uploaded any videos to these sites?

A So that was my opinion at the time based on what was circulating in the community and what I observed and what I knew at the time and believe.

Q Do you have access to Mr. Gharavi's accounts on those websites?

A Access to those accounts? I'm not sure. Could you rephrase the question please?

Q I presume you don't have access to any of Mr. Gharavi's accounts, social media accounts, website domain accounts, any accounts that Mr. Gharavi may have of his own where he uploads information. I presume you don't have access to those accounts or sites. Is that fair to say?

A No. I don't have access.

Q Do you have login credentials showing the accounts that he controls?

A No.

Q Do you have communications from him admitting to uploading videos to pornographic sites?

A No. I just have the communications that already existed prior to my comments in the wrestling community.

Q It was a "yes" or "no" question. You don't have any communications from Mr. Gharavi admitting to uploading any of those videos to any of those sites. Correct?

A Correct. I did not say I knew he uploaded content to a third-party website as a fact. I gave my opinion.

Q Do you have financial records showing that Mr. Gharavi was paid by any of these websites?

A No. I -- I don't. Aside what was produced in the -- in the discovery showing his YouTube monetization and things like that that you had showed based on those links.

Q Just to clarify, are you suggesting that YouTube is a pornographic website?

A No. I'm not suggesting that at all.

Q The only information we provided to you about YouTube monetization came from his Midwest Wrestle YouTube page. Correct?

A Correct.

Q Do you have any records --

A And those links on the YouTube page --

THE REPORTER: What was your answer?

THE WITNESS: I said, "Correct." And

those links provided on the YouTube page are how they're linked elsewhere. That's -- that's how videos are shared. Through the links.

BY MR. BECKER:

Q Do you have any evidence that any websites on which Mr. Gharavi's videos were embedded paid any money whatsoever to Mr. Gharavi in connection with those videos?

A Not from my understanding.

Q Okay. All you saw in looking at the general community of information available to you was that videos appeared on third-party sites. Correct?

A No. I don't agree with that characterization.

Q So you saw any information at all about how the videos got to those sites?

A I saw several statements again by notable members of the community predating mine were regarding his -- his videos, websites, and things of that nature. So I didn't just see a screenshot. I saw commentary in the community widespread. So not just those screenshots. No.

Q I didn't refer to screenshots. When you're talking about all this information you saw from the

Q You saw comments from third parties that indicated that Mr. Gharavi's videos were found on third party sites. We can agree on that. Correct?

A That he -- not that they were just found, but that he was monetizing them and the comments in the community were saying. So for the record, that's what I saw.

Q Okay. So you're saying you saw comments that said both?

A Well, yes. I saw comments that mainly said that the videos were -- again, in the community, that -- that's what was being discussed and that's what I responded to. So out of concern and out of my own opinion.

So this isn't just I saw -- you know, I never claimed personal knowledge that he uploaded them himself. I expressed my opinion and concern on the fact that the videos were appearing on those websites.

Q Are you reading something right now?

A No. I'm not. I'm talking to you directly.

Q It looks like you're reading something from your screen.

A I'm not reading anything from my screen. You -- you keep making assumptions. You keep making

A Formed the opinion -- yeah. I -- I didn't just form an opinion based on that. Those circulating comments predating me said the same thing.

Q Right. And you repeated those comments without doing anything additional to verify their accuracy. I think you already said that. Is that correct?

A Yeah I -- I did not conduct an independent investigation.

Q What's your typical practice for verifying the truth of information before posting it?

A I -- I couldn't tell you. I don't have a typical process.

Q Do you have knowledge of whether Mr. Gharavi has been convicted of any crimes in relationship to the videos he posted?

A No. I don't.

Q Did you ever check public records to see if he had been?

A No.

Q Did you ever conduct any of your own -- well, I think we already confirmed this. You never conducted any of your own independent investigation as to the things you had heard about Mr. Gharavi to

confirm if they were true or accurate. Right?
A No. Aside from observing what was already present in the community.
Q Right.
A I didn't check public records or anything like that.
Q Do you have any personal knowledge --
THE REPORTER: I'm sorry. What did you say, Mr. Mineo?
THE WITNESS: I said no. I did not check public records.
THE REPORTER: Thank you.
BY MR. BECKER:
Q You personally have no evidence that Mr. Gharavi controlled any third-party websites where his videos were re-posted. Do you?
A No, I did not claim to be making a factual assertion about that. No.
Q Were you aware of the risk that the statements made in your post might be untrue?
A No.
Q Did you look into whether other wrestling videos, not those filmed by Mr. Gharavi, were also appearing on those sites?

A No.
Q Did you ever investigate how those sites where the videos were found obtain their content?
A No.
Q You understand how the internet works generally?
A Yes. I mean, I'm not sure. That -- that's a pretty vague statement, but I know about the internet. Yeah.
Q I can get more specific. Anyone could download a YouTube video. Correct?
A I can't speak to the specifics of YouTube. I don't run a YouTube channel.
Q Do you know whether or not it's possible for anyone to download a YouTube video off of --
A I -- I've never a downloaded video off YouTube.
Q Do you know whether anyone could upload a video to other websites if they wanted to?
A I -- again, I can't speculate on the ins and outs of YouTube.
Q And then you don't know whether the original creator of the video that was on YouTube can control what third parties do with those videos. Do you?

that I showed earlier and produced and discovery. But I don't know exact -- you know, that was a while ago.
Q I'm just --
A So I don't know anything about it.
Q I'm just curious whether you spent any time navigating through the website mypornvid.fun before?
A No.
Q Okay. Do you know if that website actually contains pornographic images or videos?
A I -- I couldn't speak for what that website contains. It's called mypornvid.
Q Sure.
A I -- I don't know.
Q I'm going to show you what we're marking as Exhibit 13.
MS. O'TOOLE: Previously marked as Exhibit 9.
MR. BECKER: Oh. Is it 9? Okay. Let's go back to Exhibit 9. Let's do a quick five-minute break just so we can get our exhibits in place because I got to verify something.
Patrick, why don't you take five? It's 2:07.
THE WITNESS: Okay.

(Discussion held off the record.)
BY MR. BECKER:
Q Let me ask you a different question. Do you have any evidence that Mr. Gharavi owns mypornvid.fun?
A Can you restate that question? I'm sorry. I just -- I'm just listening to --
Q Do you have any evidence that Mr. Gharavi owns mypornvid.fun?
A No.
Q Do you have any evidence he has an account with that website?
A No. Not from my understanding.
Q Do you personally have any knowledge as to whether he uploaded any content to that website?
A Not from my understanding. Aside from, again, my opinions of seeing it there and seeing his -- his tag for Midwest Wrestle and his link to his channel there.
Q Do you know what mypornvid.fun is?
A It has the word "porn" in it. So again, I can't speculate on what it is.
Q But you said it has the word "porn" in there. So I guess it seems like you speculated as to what it is in your posts that we looked at, but you're

site. Correct?
A Based on how it presents itself in the name. Correct.
Q Did you know that mypornvid.fun is actually just a video aggregator site?
A Not from my understanding.
Q Were you aware that mypornvid.fun scrapes videos from other sites?
A Not from my understanding. No.
Q Kind of like how Google images scrapes images from other sites. The aggregator finds videos and embeds them. You weren't aware that that's what mypornvid.fun actually is?
A I was not aware of that because it's not called Google. It's called mypornvid.fun with videos of minors.
Q Sure. Well, you saw the video that Mr. Gharavi had made was there. Yes. Of course. And those were high school students in wrestling matches. I agree with you. But you don't know how those videos actually ended up on mypornvid.fun. Do you?
A Aside from seeing that they're linked to certain channels, no.
Q So are you familiar with how video

seen posted.

Q Right. You saw other people posted about mypornvid.fun and you posted it, too. Correct?

A Correct.

Q And you did not know at that time that that website was actually merely a video aggregator site? Nothing that you read in the circulation of information concerning this indicated that. Did it?

A Indicated that I did not know? No because -- indicated --

Q Indicated that it was a video aggregator site.

A Well, I -- I didn't know that. So no.

Q Because it wasn't posted in the universe of posts that you were looking at. Correct?

A Because I have no understanding of what a video -- of how that works. So I was going based off of mypornvid.fun.

Q Sure. And that's all you did was you went based on the name of the site itself. Correct?

A No, based on the public commentary already happening, where I certainly wasn't a first person to share this screenshot and based on publicly circulating information and my -- how it's presented,

Q mypornvid.fun?

A No. I -- I clicked the website. As I said, I clicked the website. So I saw the video on the website. I didn't research the whole website. I -- I as a normal human being, I saw -- I wasn't going to click around on what is perceived as a pornographic website.

Q I understand that. I'm not suggesting to you that it would be wrong for you not to desire to go into what you perceive might be a pornographic website. With that said, you didn't go beyond clicking on the video that you saw in the social media posts to see it on that website. You didn't search any deeper into that website beyond the post that you saw that led you to form your opinion. Correct?

A Yes. And that's not what just led me to form my opinion. As I stated, there was lots of commentary prior to this of people sharing the same website and the same screenshot and the same opinions in a sense prior to me. So it's not something I came up with on my own.

Q I hear you when you're explaining to me again, what was the basis of your opinion and the reason that you made your statements. The primary

question I was asking you about -- for a moment, though. We can get to the other points in a second.

What I'm asking you specifically right now, though, is to confirm that beyond clicking on the video that we've looked at today already from mypornvid.fun that brought you to be able to see the video on that site, you did not navigate further into that site. Correct?

A Correct. I did not conduct a deeper investigation. I wasn't acting as an investigator or journalist or law enforcement. I expressed my opinion based on what I observed and what was circulating.

Q Okay. This has already been a long day. Federal depositions can go on for a long time. I'm not trying to prolong it, but when I ask a "yes" or "no" question, you don't have to provide more information than I'm actually asking for.

I don't think that what you're adding is responsive to the question. Okay? And we can get them a lot faster if on those questions where they're "yes" or "no" you're able to answer it. If you need to add more information, obviously do so, but I don't think every question requires you to repeat the basis of your opinions. Okay?

conduct an investigation. So that's what I was aware of based on my belief at the time.

Q And you accused Mr. Gharavi of uploading his sites to a pornographic website? Or you accused Mr. Gharavi of uploading his videos to a pornographic website anyway. Correct?

A Well, I formed an opinion based on publicly available information and what I believed at the time.

Q Okay. And your opinion was that he was posting videos to a pornographic website? That's what you're saying your opinion was?

A I never stated that as a verifiable fact. I gave an opinion based on what I was seeing at the time and the information that was recirculating.

Q Okay. Where did you get your screenshot if you didn't visit the site?

A I don't recall exactly. And as I stated, I did click into the site after that, but I -- again, I don't recall the exact details. This was over two years ago.

Q Okay. We're going to look at a thread from InterMat now. The entire thread, for the record, is much wider and broader than we need to present into evidence. But for reference, it's bates stamped

as a takedown request. I -- I -- that's -- that's the extent of what I know.

Q Right. So a takedown request that you're referring to, that's part of the DMCA, the Digital Millennium Copyright Act, where someone that owns video footage or images or music can submit a request to a third-party site to have their content taken off that site if somebody else posted it there without their permission. Okay?

Did you know at the time you were posting things in January of 2024 that Mr. Gharavi may have filed these notices?

A No.

Q Did you ever consider that he might be trying to get his videos removed from these sites?

A No.

Q So I'm guessing --

A I had no knowledge of the process as I stated.

Q And since you had no knowledge of the process, I'm guessing you never asked him about his DMCA efforts. Right?

A Well, I didn't know what DMCA was.

Q Nor had you talked to him. So clearly you

published all those statements about Mr. Gharavi anyway. Right?
A I gave my opinions based on what was already circulating in the community publicly.
Q You didn't post those opinions accidentally. Did you?
A No. I gave my opinions based on what was already circulating.
Q You intentionally posted those posts. Right?
A I gave my opinion.
Q You intentionally posted those posts, which contained what you're describing as your opinion. Correct?
A I gave my opinion.
Q Intentionally?
A I simply posted.
Q Those posts were posted as a momentary mistake. Right?
A So yes. I intended --
Q You intentionally posted those posts. Right?
A Yes. My -- my statements within them reflected opinions based on information publicly

circulating. Yes. I -- I clicked those posts. Correct.

Q And you posted on Twitter multiple times. Correct?

A Correct.

Q You posted a lengthy detail post on Facebook. Correct?

A I don't know what you're referring to.

Q The Facebook post that we looked at earlier. The call to action.

MS. O'TOOLE: That's Exhibit 11.

MR. BECKER: Are you sure?

MS. O'TOOLE: There's two different ones. Exhibit 11 or Exhibit 9.

BY MR. BECKER:

Q I mean, we can look at both. Exhibit 9 and 11 are our Facebook posts you posted in the Wrestling Room. Do you recall looking at those posts with me earlier?

A Yes. I do. You're -- you're breaking up a little bit here, so I just --

Q Do you recall

A Can -- can you repeat that? You said I recall -- I recall looking --

Q Do you recall walking through with me multiple posts on Facebook and X. Correct?
A Yes. I do.
Q Okay.
A Yeah. I -- I do.
Q You recall tagging specific organizations in those posts like Midwest Wrestle and IHSA?
A Yeah. I did tag to encourage review and oversight based on the publicly circulating concerns. I didn't intend to cause harm or assert facts that I knew to be false at the time.
Q Okay. But you did assert facts that you did know to be true at the time. Didn't you?
A Again, I'm just telling you based on my opinion, what I believed at the time and what was available to me.
Q You gave explicit instructions to quote, "contact everyone" to have this person removed from the wrestling community. Correct?
A I don't recall giving specific instructions.
Q Did you say, "contact everyone"? Did you not tell people to contact everyone to get your videos taken down to have this person removed from being around schools and children?

the time you made this accusation. Correct? Or any of the statements you made?

A I didn't conduct an independent investigation.

Q You didn't contact Mr. Gharavi. Correct?

A No. I didn't contact him. No.

Q You didn't contact YouTube to investigate. Correct?

A I didn't -- I didn't conduct a personal investigation. I was giving my opinion based on what was happening at the time in the community, the widespread concern that predated me.

Q Yes. I've heard you say that before. I asked you a different question. You didn't contact YouTube to investigate anything. Did you?

A No. No.

Q You didn't contact the police before publishing any of your statements. Did you?

THE REPORTER: Wait. Wait a minute, Mr. Becker. I don't think you're letting him answer his question.

MR. BECKER: He already said, "No." I thought he said, "No."

THE REPORTER: You didn't contact

YouTube to investigate anything. Did you?
THE WITNESS: No. I did not.
BY MR. BECKER:
Q You didn't contact the police before publishing your statements. Correct?
A Before publishing my opinions I did not.
Q Yet you posted them to 44,000 people anyway. Is that correct?
A I shared my opinion on my page, my personal account, as you could see, Pat Mineo.
Q Which has over 40,000 followers. Correct?
A No. My personal account, Pat Mineo, doesn't have over 40,000 followers. This is my Facebook account.
Q You posted some of these into the wrestling group account, too. Didn't you?
A I posted them from my personal account, my opinions.
Q Were none of your statements made -- posted in the wrestling group forum?
A They were. This is from my personal account, though, as you can see.
Q I'm not referring to the post that's on the screen right now. I'm talking about the posts that

we've looked at over the course of the day. Numerous posts by you were posted either on your X account, your Facebook account, and also in the wrestling group forum. Correct?

A Comments and posts that we went over, correct. Along with all the other posts that predated mine.

Q When you were sued, did you apologize for any of the statements that you made?

A You -- you were breaking up there, again. It says that it's slow.

Q When you --

A Did you say -- I -- all I heard was "When you were sued."

Q When you were sued, did you apologize for your statements in any way?

A No.

Q Did you retract your statements?

A No.

Q Instead, you mocked the lawsuit. Correct?

A I mocked the lawsuit? I know you're referring to a post where I gave an opinion.

Q Okay. I'm going to show you what we're marking as Exhibit 17.

wasn't aware of -- someone just showed me that online.
Q You knew who Nima Gharavi was the day that you got sued. Correct?
A I got served in late March.
Q You're missing my point. You knew who Nima Gharavi was at the time you posted this post. Correct?
A I knew of him.
Q Well, you make reference to "Midwest Wrestle guy" and all the posts that you made about him predated this post. Correct?
A I -- yeah. I'm not sure what you're getting at, but yes.
Q Mr. Mineo, you posted a number of posts specifically about Nima Gharavi and Midwest Wrestle in January of 2024. Correct?
A That is correct.
Q And in March of 2024, you posted this post saying, "Hey. Look, everyone. The Midwest Wrestle guy is suing half of the wrestling media people." Correct?
A Yes. That was, I believe, a couple weeks prior to me being served for the actual lawsuit. So it was just what was publicly available online that I

CERTIFICATE OF DEPOSITION OFFICER

I, KAREN KEIM, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



KAREN KEIM
Notary Public in and for the
State of Illinois

CERTIFICATE OF TRANSCRIBER

I, MILIRA GARDNER, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

MILIRA GARDNER